IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NICOLE GLENN, | ) Case No. 1:16-cv-2531 |
| | ) |
| Plaintiff, | ) JUDGE CHRISTOPHER A. BOYKO |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |

**I.       Introduction**

Plaintiff Nicole Glenn seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ supported her evaluation of the opinion evidence with substantial evidence, I recommend that the final decision of the Commissioner be **AFFIRMED**.

**II.      Procedural History**

In 2013, Glenn filed an application for DIB, alleging disability based on a learning disability with a disability onset date of January 1, 2002 (when Glenn was 11 years old).  (Tr. 110-21).  Glenn declared she could not write more than her own name and that she was illiterate. (Tr. 110)  After the Social Security Administration denied her application (Tr. 121-40), she attended a hearing before Administrative Law Judge Pamela E. Loesel ("ALJ").  (Tr. 62-96)  On

November 2, 2015, the ALJ denied Glenn's claim for benefits. (Tr. 46-61) The Appeals Council declined to review the case, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1-7)

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

2

      assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

The ALJ issued a decision on November 2, 2015, finding:

1. Glenn did not engage in substantial gainful activity since August 27, 2013, the application date. (Tr. 51)

2. Glenn had the following severe impairments: borderline intellectual functioning; anxiety disorder, including posttraumatic stress disorder (PTSD); and affective disorder, including depression/schizoaffective disorder. (Tr. 51)

3. Glenn did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 52)

4. Glenn had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand verbal instructions for simple routine repetitive tasks consistent with unskilled work. The claimant can perform work with no fast pace or high production quotas where the work involves infrequent change or where those changes are easily explained verbally. She can have superficial interaction (meaning of a short duration for a specific purpose) with others and no direct work with the general public (meaning no customer service type work). The claimant can perform low stress work (meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility). (Tr. 53)

3

5. Glenn has no past relevant work. (Tr. 56)

6. Glenn was born on December 22, 1990 and was 22 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (Tr. 56)

7. Glenn has a limited education is able to communicate in English. (Tr. 57)

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. (Tr. 57)

Based on these findings, the ALJ determined that Glenn had not been under a disability from the August 27, 2013 DIB application filing date. (Tr. 57)

V.  **Relevant Evidence**

   A.  **Medical Evidence**

Glenn alleges a disability onset date of January 1, 2002. (Tr. 110) Although there is evidence that Glenn suffered from a history of traumatic childhood events, there are limited medical records in this case. In June 2005, at the age of 14, Glenn underwent a mental health assessment due to a history of running away and suicide attempts. (Tr. 264) She received a diagnosis of Major Depressive Disorder, recurrent, severe, without psychotic episodes and Post-Traumatic Stress Disorder (PTSD), chronic. (Tr. 274) In 2006, a psychiatrist reported that Glenn's depression was "in remission" and her PTSD was "in partial Remission." (Tr. 260) In 2007, Glenn's records again indicated a diagnosis of PTSD with anxiety and depressive mood, but clarified that she no longer suffered from major depression. (Tr. 258)

A September 2005 Individualized Educational Plan described Glenn's behavior to be "very problematic." (Tr. 192) Intellectually, Glenn's IQ scores fell in the low to low average range (70-79) and it was determined that she functioned in the "upper limits of the 'borderline

slow learner range.'" (Id., 203, 213) The assessment noted that writing was a relative strength for Glenn. (Id.)

In October 2013, at age 22, the Division of Disability Determination referred Glenn for a consultative examination by Michael Faust, Ph.D. (Tr. 286-93) Glenn stated that she requested disability benefits because she was unable to read or write. (Tr. 286) She reported attending special education classes and dropping out of school in the 10th grade. (Tr. 287) Glenn reported that she last worked for Wendy's in April 2013 but was fired for complaining about not getting enough hours. (Tr. 287) She also reported prior janitorial work and denied any problems with attendance, tardiness or getting along with coworkers or supervisors. (Id.) She asserted she could not work because she couldn't read or write. (Id.)

Dr. Faust noted that Glenn exhibited no evidence of attention deficits and no difficulty understanding even complex or multi-step instructions throughout the exam. (Tr. 289) Glenn did not appear anxious or depressed. (Id.) She denied pervasive symptoms of anxiety or depression and reported no history of psychosis such as hallucinations. (Id., 293) She scored in the borderline intelligence range on IQ testing. (Tr. 289) Dr. Faust opined that Glenn had no limitations in any work-related mental abilities. (Tr. 292-93)

On October 25, 2013, state agency consultant Irma Johnston, Psy.D., reviewed Glenn's claim file. Dr. Johnston found evidence of an organic mental disorder resulting in mild difficulties of daily living and maintaining social functioning, as well as moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 114) Dr. Johnston opined that Glenn retained the ability to understand verbal instructions for simple, repetitive tasks. (Tr. 116). Dr. Johnson state that Dr. Faust's opinion was "without substantial support from other evidence of

5

record which renders it less persuasive." (Tr. 118) State agency consultant Vicki Warren, Ph.D., affirmed Dr. Johnston's findings on January 6, 2014. (Tr. 125-28)

In April 2015, Glenn's attorney referred her to David V. House, Ph.D., for a second consultative examination (CE). (Tr. 295-303) Dr. House noted that Glenn presented confused and disoriented at times. (Tr. 295) Glenn reported that "she might" have worked at a Wendy's Restaurant and got fired for being unable to keep up with the work. (Tr. 298) She denied work elsewhere. (Id.) Glenn reported being prescribed Seroquel and stated that her medication helped her sleep. (Tr. 298, 299)

Glenn appeared depressed and complained of frequent crying episodes and constant panic attacks. (Tr. 299) She also reported auditory and visual hallucinations occurring for years day and night. (Tr. 300) She stated that she would not talk about these items in past exams and that her medical provider did not believe her. (Id.) On examination, Dr. House noted problems with Glenn's memory and concentration. (Tr. 301) Dr. House noted that Glenn tested in the borderline intelligence range for IQ. (Id.)

Glenn reported residing with her partner and her partner's mother. (Tr. 302) She stated that she need to be told what to do in various aspects of daily living. (Id.) She also stated that she rarely went out. (Id.)

Dr. House opined that Glenn suffered from a Schizoaffective Disorder, PTSD, Borderline Intellectual Functioning; and a Learning Disorder. (Tr. 302) He opined that Glenn had marked limitations in all listed functional areas including her ability to carry out instructions, concentrate, to respond appropriately to coworkers and supervisors, and handle work pressures. (Tr. 30) He further opined that Glenn would be a significant disruption and dysfunction in a work environment. (Tr. 303)

In April 2015, Mary Lieder, CNP, prescribed Seroquel. (Tr. 305)

**B.    Testimonial Evidence[2]**

Glenn testified that she spent most days in her room with the lights off lying down. (Tr. 74) She testified that meals are usually made for her, but she sometimes did chores like dishes when told to do so. (Tr. 72-74) Glenn stated that the other people living in her home, including children, come visit her in her room. (Tr. 83-84) She testified that she sometimes goes to the grocery store with a big group to feel comfortable. (Tr. 85-86) She stated that she did not pay for groceries because she had no income but could make simple change, explaining that if she had $5 and something cost $3 she would get $2 back. (Tr. 86)

Glenn stated that she last worked part-time at Wendy's, but was fired because she asked her boss for more hours. (Tr. 76-77) Glenn felt she could not work full-time because (1) a problem with reading and (2) severe hallucinations. (Tr. 79) She stated that she started experiencing auditory and visual hallucinations "a couple years ago." (Tr. 79, 80) She described hearing voices telling her to kill herself or someone else and seeing aliens, demons, and soldiers. (Tr. 80-81)

Glenn claimed that Seroquel helped her lessen the hallucinations and sleep more. (Tr. 81-82) However, at the time of the hearing. Glenn had been without medication for nearly 60 days due to lack of insurance and stated it had been "hell" for her. (Tr. 83) She stated without medication she sleeps only one hour each night and could not sleep during the day because her brain was racing and she heard noises. (Tr. 85)

---

[2] Vocational Expert Carol Mosley also testified at the hearing. (Tr. 87-95) Because that testimony is not relevant to the distinct issues raised in this action, it is not summarized here.

7

**VI.  Law & Analysis**

    **A.  Standard of Review**

This court's review is limited to determining whether substantial evidence in the record supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (*quoting Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,*

8

774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.    Analysis**

Glenn argues that the ALJ failed to support her evaluation of the opinion evidence with substantial evidence, because she should have given greater weight to the opinion of the second consultative examiner, Dr. House. ECF Doc. No. 12, Page ID# 384-87. The Commissioner counters that the ALJ reasonably analyzed Dr. House's opinion under the regulations and appropriately found it "unsupported by, and inconsistent with, the other substantial record medical evidence." ECF Doc. No. 14, Page ID# 411-19. For the following reasons, the Commissioner has the better argument.

Under the regulations, Dr. House is a non-treating source because he examined Glenn but did not have an ongoing treatment relationship with her. 20 C.F.R. § 416.902. An opinion from a nontreating source is not entitled to special deference, and the ALJ need not give "good reasons" for the weight afforded such opinions. See 20 C.F.R. § 416.927(c)(2); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding that "the SSA requires ALJs to give reasons for only treating sources"). Nonetheless, the ALJ must assess the nontreating source's opinion under the relevant factors provided for in 20 C.F.R. § 416.927(c) including: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, and (6)

9

specialization. 20 C.F. R. § 416.927(c).  However, the ALJ need not expressly consider each of these factors. *Tilley v. Comm'r of Soc. Sec.,* 394 F. App'x 216, 222 (6th Cir. 2010).

The ALJ noted Dr. House's examining relationship with Glenn.  (Tr. 56)  The ALJ also acknowledged Dr. House's specialization (i.e. PhD).[3]  (Id.)  She discussed Dr. House's findings but determined that there was "no support in the record for the marked limitations that Dr. House suggests."  (Id.)  The ALJ also explained that the opinion was "entirely inconsistent with Dr. Faust's thorough examination."  (Tr. 56)  Thus, it is evident that the ALJ assessed Dr. House's opinion using the correct factors.  Drs. House and Faust saw the same person less than two years apart and reached different conclusions.  The ALJ chose to give "little" weight to one and "some" weight to the other.  Substantial evidence supports the ALJ's assessment.

One of the reasons the ALJ did not fully credit Dr. House's opinion is because it was "entirely inconsistent with Dr. Faust's thorough examination."  (Tr. 56)  Glenn attempts to discredit Dr. Faust's report, arguing that Dr. Faust did not consider her school records and did not offer a diagnosis.  ECF Doc. No. 12, Page ID# 385-86.  Glenn also notes that the ALJ and the agency reviewers only gave "some weight" to Dr. Faust's report.  Id.

Regarding the failure to give a diagnosis, a diagnosis neither indicates the severity of the impairment nor describes functional limitations.  *Young v. Sec'y of HHS*, 925 F.2d 146, 151 (6th Cir. 1990).  Thus, it is unclear how the absence of a diagnosis affected the validity of Dr. Faust's evaluation report or opinions.

As to the school records, it is irrelevant whether Dr. Faust had access to Glenn's school records because Dr. House did not have access to these records either.  See Dr. Faust's report

---

[3] Although Glenn argues that that ALJ should have afforded Dr. House's opinion greater weight due to his specialization, Dr. House and Dr. Faust were both Ph.D. psychologists.  (Tr. 293, 295)  Neither was entitled to greater deference because of qualifications alone.

(Tr. 297) ("Glenn indicated she had gotten as far as the 10th grade.  It was not clear where.")  Thus, Glenn's implication that Dr. Faust's failure to review her school records made his report less trustworthy could also undermine Dr. House's report.  But the ALJ actually had the school records and considered them when determining whether the opinion evidence was consistent with the record as a whole, something she was required to do.  Based on this, the ALJ found that the combination of the records and Glenn's hearing testimony supported only moderate limitations in social functioning and concentration.  (Tr. 56)

As argued by the Commissioner, one of the most glaring problems with Glenn's arguments is that Glenn conflates the examination and opinion portions of Dr. Faust's report. (Tr. 55-56)  ALJ gave "some weight" to Dr. Faust's *opinion* because she found that Glenn's school records and hearing testimony supported moderate limitations in social functioning and concentration.[4] (Tr. 56)  However, the ALJ provided that the *examination* portion of the report was "well supported" and "thorough."  (Id.)  The examination portion of the report outlined Glenn's self-reported background information and symptoms, as well as testing and observations made during the examination.  (Tr. 286-92)  And as the ALJ provided, Dr. House's opinion and examination were inarguably inconsistent with Dr. Faust's examination.

For example, Glenn reported during Dr. House's examination that she experienced hallucinations as a child that had returned "a couple of years" prior. (Tr. 302)  However, just eighteen months earlier Glenn "denied ever experiencing such symptoms" to Dr. Faust.  (Tr. 289).  She reported to Dr. House that she got fired from her job at Wendy's because she "couldn't keep up with the work," despite telling Dr. Faust that she got fired from the same job for complaining that she didn't have enough hours.  (Tr. 287, 298)  Notably, Glenn testified at

---

[4] These limitations were more severe than Dr. Faust had found (a finding that actually went in Glenn's favor).

11

the hearing consistently with her report to Dr. Faust – that she got fired for asking for more hours and stated that she had no problems or complaints prior to that time. (Tr. 55, 77)  Dr. Faust found that Glenn did not demonstrate any memory or attention disorders during mental status tasks or tests (Tr. 290).  In fact, Dr. Faust noted that she had "no difficulty understanding questions or instructions, including complex or multi-step instructions" and had "no trouble recalling details of her history."  (Tr. 289)  Dr. Faust also noted that Glenn had "no observable difficulty staying focused and attended to the tests and conversations at hand."  (Id.)  In contrast she had reported difficulties completing Dr. House's tasks and her concentration appeared markedly limited.  (Tr. 301)  Thus there were numerous contradictions, not just in Dr. Faust's observations, but in Glenn's self-reports.[5]  Thus, the ALJ's determination regarding the weight to be given to these opinions is well-supported by the record.

The ALJ also had proper support for her determination that Dr. House's extreme limitations were inconsistent with the record evidence.  As to the issue of marked limitations, the Commissioner measures the severity of a mental disorder in terms of the degree of limitation in various functional areas using a five-point scale:  none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a.  Dr. House opined that Glenn had marked limitations in various functional areas including her ability to understand and carryout instructions, concentrate, and

---

[5] An ALJ is permitted to discount a medical opinion based largely on claimant's subjective reports if the ALJ has sufficient reasons for discounting the claimant's credibility.  *See e.g. Ditz v. Comm'r of Soc*. Sec., No. 08-11547, 2009 WL 440641, at *13 (E.D. Mich. Feb. 20, 2009) ("[T]he ALJ is permitted to discount any such treating physician opinion if it is based on claimant's subjective reports and the ALJ has sufficient reasons to discount the claimant's credibility.").  Here, the ALJ found Glenn's subjective complaints were not entirely credible.  (Tr. 54)  She determined that the record did not support more than moderate limitations.  (Tr. 55)  The ALJ pointed out that Glenn reported being fired for requesting more hours, not because of any impairment in functioning and reported no difficulties getting along with coworkers. (Id.)  The ALJ also found Glenn's claims that she could not read or write contradicted by her academic records and the fact that the alleged reading/writing limitations caused no reported difficulties in past jobs. (Id.)  As the ALJ pointed out, Glenn's writing was considered a "relative area of strength" by school examiners.  (Tr. 203)

get along with others in a work setting. (Tr. 303) In fact, Dr. House opined that Glenn would be "a significant disruption and dysfunction in a work environment. (Id) The ALJ said that there was "no support" elsewhere in the record for these limitations. The ALJ's determination is supported by substantial evidence including three other medical opinions and other record evidence. Notably, Glenn had successfully worked in various jobs. She left those positions not because she couldn't do the work but because she asked for more hours or moved to a different state.

The three other medical opinions all concluded that Glenn possessed no marked limitations. Dr. Faust found no limitations in Glenn's work-related mental abilities. Although Drs. Johnston and Warren did not completely agree with Dr. Faust, they opined that Glenn had only mild restrictions in daily living and social functioning and moderate difficulties in maintaining concentration.[6] They too, as did the ALJ, found Glenn to be *more* limited than Dr. Faust had, a finding that weighed in Glenn's favor. (Tr. 114, 125) In short, none of the other three medical opinions found any marked limitations.

In consideration of all of the evidence, the ALJ concluded that Glenn experienced moderate difficulties in concentration and social functioning, and mild restriction in activities of daily living. As to daily living, although Glenn reported staying in her room all day with the lights off and having difficulties in school and using community resources, she previously demonstrated various skills for independent living such as cooking; using public transportation;

---

[6] The ALJ could appropriately rely on the state agency physicians' opinions even though there determinations were made prior to Dr. House's examination. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed.Appx. 26, 32 (6th Cir. 2009) (concluding that an ALJ may rely on a state agency physician's opinion that is not based on all of the medical evidence in the record if the ALJ takes into account any evidence that the physician did not consider). Here, the ALJ did that and, taking into account all evidence (including Dr. House's opinion) found that Glenn experienced a more severe limitation in social functioning than that recognized by the state agency physicians.

taking care of her personal needs; doing chores; and going shopping. (Tr. 52, 112) The ALJ also acknowledged Glenn's ability to calculate correct change for purchased items. (Tr. 52, 86) In social functioning, the ALJ noted that although Glenn stated she did not have friends she lived with her girlfriend and her girlfriend's family; reported close relations with her own family; enjoyed playing with nieces and nephews; and reported that she had no difficulties getting along with coworkers and supervisors in the past. (Tr. 52, 77, 83-84, 293) Finally, the ALJ determined Glenn had moderate difficulties with regard to concentration, persistence or pace. (Tr. 52) Glenn had not demonstrated any attention deficits during her examination by Dr. Faust and was able to perform simple math and other tasks. (Id.) However, the ALJ acknowledged that Glenn had difficulty maintaining attention and focus while in school and provided moderate limitations in this area. (Id.)

Glenn has not shown that these ALJ findings lacked support in the record evidence or that the ALJ misrepresented the evidence. Instead, Glenn has only pointed out the obvious conclusion that these findings are not consistent with Dr. House's opinions. However, the court "must defer to an agency's decision even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997) (internal quotations omitted); *See also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)( "If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.") Here, substantial evidence supported the ALJ's determination that no marked limitations existed and that Dr. House's opinion largely conflicted with Dr. Faust's examination findings and the record as a whole. Further, substantial evidence supported the ALJ's weighing

of the opinion evidence. Thus, we must defer to the ALJ's determination even though Dr. House's findings support an opposite conclusion.

## VII. Recommendation

Contrary to Glenn's argument, the ALJ properly analyzed Dr. House's opinion and substantial evidence supports the ALJ's determination. I recommend that the ALJ's decision be **AFFIRMED.**

Dated: October 16, 2017

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).